1  HELANE L. MORRISON (State Bar No. 127752)
   ROBERT L. MITCHELL (State Bar No. 161354)
2  MICHAEL S. DICKE (State Bar No. 158157)
   CRAIG M. HUGHES (State Bar No. 114970)
3
   Attorneys for Plaintiff
4  SECURITIES AND EXCHANGE COMMISSION *E-filing*
   44 Montgomery Street, Suite 2600
5  San Francisco, California 94104
   Telephone: (415) 705-2500
6  Facsimile: (415) 705-2501

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10                   SAN FRANCISCO DIVISION

11  SECURITIES AND EXCHANGE COMMISSION     Case No. C 04 4120

12          Plaintiff,

13     vs.                                 COMPLAINT FOR PERMANENT
                                           INJUNCTION AND OTHER LEGAL AND
14  DONALD M. FITZPATRICK AND THOMAS R.    EQUITABLE RELIEF
    STITT,
15                                         DEMAND FOR JURY TRIAL
            Defendants.
16

17

18      Plaintiff Securities and Exchange Commission (the "Commission") alleges:

19                          **SUMMARY OF THE ACTION**

20      1.      This matter involves financial reporting fraud by former executives of Liberate

21  Technologies ("Liberate" or the "Company"), a San Carlos, California software manufacturer.

22  The fraud, which ran from at least November 2001 to September 2002, was carried out by Donald

23  M. Fitzpatrick ("Fitzpatrick"), who was then Liberate's head of sales and Chief Operating

24  Officer, and Thomas R. Stitt ("Stitt"), then a regional sales Vice President.

25      2.      Fitzpatrick and Stitt fraudulently inflated Liberate's reported revenue in several ways.

26  In one instance, defendants secretly funneled Liberate funds to a customer, to enable that

27  customer to pay for a software license from Liberate (a so-called "round-trip sale"). In another,

28  defendants misled Liberate finance personnel about the amount of work remaining on a

                                                              COMPLAINT

1   development project, which caused the Company to recognize revenue prematurely. Fitzpatrick

2   also caused Liberate to recognize revenue improperly upon shipment of a product that he knew

3   was inadequate to meet a customer's needs. And in another instance, Fitzpatrick granted a

4   customer price concessions that substantially reduced the revenue that Liberate would realize on a

5   contract, without disclosing the concessions to Liberate finance personnel.

6        3.     In furtherance of the fraud, defendants repeatedly misrepresented or withheld

7   information about key elements of the transactions from Liberate finance personnel responsible

8   for revenue recognition and from the Company's independent auditors. As a result of defendants'

9   fraud, Liberate materially overstated its revenue in filings with the Commission and press releases

10   for the second and third quarters of its fiscal year 2002 and for that entire year, and also for the

11   first quarter of its fiscal year 2003.

12        4.     The Commission seeks a court order barring Fitzpatrick and Stitt from serving as

13   officers and directors of any public company; ordering them to disgorge all benefits received as a

14   result of their violations of the securities laws; imposing civil monetary penalties; and enjoining

15   them from future securities laws violations.

16             **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

17        5.     The Commission brings this action pursuant to Sections 20(b) and 20(c) of the

18   Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(c)] and Sections 21(d) and

19   21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and

20   78u(e)].

21        6.     This court has jurisdiction over this action pursuant to Sections 20(c) and 22(a) of the

22   Securities Act [15 U.S.C. §§ 77t(c) and 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §

23   78aa]. Fitzpatrick and Stitt, directly or indirectly, have made use of the means and

24   instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

25   exchange in connection with the acts, practices and courses of business alleged in this Complaint.

26        7.     Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C.

27   § 78aa]. One of the defendants resides and transacts business in, and a substantial part of the acts

28   or transactions constituting the violations occurred in, the Northern District of California.

COMPLAINT

1       8.      Assignment to the San Francisco Division is appropriate pursuant to Civil Local Rules

2    3-2(c) and 3-2(d) because a substantial part of the acts and omissions giving rise to the

3    Commission's claims occurred in San Mateo County, California.

4                               **DEFENDANTS**

5       9.      Fitzpatrick, age 48, resides in or near Sydney, Australia. At the time of the events

6    alleged in this Complaint, he resided in Palo Alto, California. Fitzpatrick was Liberate's Vice

7    President of Sales and Professional Services from January 2000 until June 2002, when he was

8    promoted to Chief Operating Officer ("COO"), a position he held until November 2002. Liberate

9    terminated Fitzpatrick's employment for cause in December 2002.

10      10.     Stitt, age 50, resides in Redwood City, California. He was Liberate's Vice President

11    of Sales for the Asia and Pacific Region from the summer of 2001 until the Company terminated

12    his employment for cause in January 2003.

13                         **RELEVANT ENTITY**

14      11.     Liberate is a software manufacturing company with its principal place of business in

15    San Carlos, California. The Company sells software and services for large cable and

16    telecommunications networks. At the time of the events alleged in this Complaint, Liberate's

17    common stock was registered with the Commission pursuant to Section 12(g) of the Exchange

18    Act [15 U.S.C. § 78*l*(g)] and traded on the Nasdaq Stock Market.

19                      **FACTUAL ALLEGATIONS**

20      12.     During the course of its fiscal year 2002, which ended May 31, 2002, Liberate found it

21    increasingly difficult to generate revenue to meet the quarterly expectations it had announced to

22    the public. In an effort to reach the Company's quarterly revenue goals, Fitzpatrick and Stitt

23    caused Liberate to recognize revenue fraudulently on a number of transactions. As part of the

24    fraud, Fitzpatrick and Stitt (who reported directly to Fitzpatrick) repeatedly misrepresented or

25    withheld material facts about the transactions from Liberate's finance personnel and its

26    independent auditors.

27

28

## I.   Defendants' Fraudulent Conduct

### A.   Fitzpatrick Caused Liberate to Recognize Revenue Improperly on the Sale of a Non-Performing Product

13.     Starting in November 2001, Fitzpatrick caused Liberate to fraudulently recognize a total of $2.6 million in revenue on a set of related contracts with Broadband Solutions, Inc. ("BSI"), a cable company doing business in South Korea. Revenue recognition was improper because the software that Liberate delivered to BSI under these contracts was inadequate to meet the customer's needs. Fitzpatrick knew or was reckless in not knowing that the software was inadequate to meet BSI's needs, but concealed this information from Liberate's finance personnel.

14.     In March 2001, Liberate and BSI entered into a license agreement. The agreement called for Liberate to provide software that BSI could use to display Korean language print on television screens. As Fitzpatrick knew, BSI ultimately intended to deploy the software throughout an entire cable network.

15.     As of March 2001, Liberate was developing but did not have a product capable of displaying Korean language print and supporting an entire cable network. Because Liberate did not have a functioning product, the Company did not ship any software to BSI in March 2001 and did not recognize revenue on the license agreement at that time.

16.     Also during 2001, Liberate entered into another agreement with BSI to develop a digital cable network and integrate Liberate's software into the network.

17.     By November 2001, Liberate had developed a product that was minimally able to display Korean language print on a television in a laboratory setting. However, as Fitzpatrick knew or was reckless in not knowing, the software was not suitable for deployment because it was not capable of supporting an entire cable network. Despite this, in November 2001, Fitzpatrick caused Liberate to ship the software to BSI.

18.     In or about November 2001, Fitzpatrick told both BSI and Liberate finance personnel that the software the Company had shipped was suitable for deployment with, at most, minor alterations. This statement was false, and Fitzpatrick had no reasonable basis for it.

19.     As a result of Fitzpatrick's fraudulent conduct, Liberate improperly recognized software license revenue and related billings for system integration work totaling $1.7 million for its second quarter of fiscal 2002, ended November 30, 2001; $787,566 for its third quarter of fiscal 2002, ended February 28, 2001; and $75,000 for its fourth quarter of fiscal 2002, ended May 31, 2002.

20.     Under Liberate's internal revenue recognition policy and generally accepted accounting principles ("GAAP"), it was improper for Liberate to recognize revenue in these quarters under its contracts with BSI because the Company had not delivered a product that was adequate to meet BSI's needs.  Fitzpatrick knew or was reckless in not knowing that revenue recognition was improper.

**B.      Fitzpatrick and Stitt Caused Liberate to Recognize Revenue Improperly on a Round-Trip Sale**

21.     In May 2002, Fitzpatrick and Stitt caused Liberate to enter into an agreement to license its software to Mod Studios, Inc. ("Mod") for $543,750.

22.     Unlike most Liberate customers, Mod was not a large cable or telecommunications network operator, but rather a small video production company, and it did not have the ability to pay for the software license from Liberate.  As a result, two people related to Mod obtained a bank instrument called a letter of credit, which was used to guarantee payment under the license agreement.  Although Mod did not pay any cash at the time, based on the existence of the letter of credit Liberate's finance department recognized the full amount of the license, or $543,750, as revenue for the fourth quarter of its fiscal year 2002, which ended May 31, 2002.

23.     The license agreement with Mod was a sham.  Unbeknownst to Liberate's finance personnel, Mod did not intend to use its own funds, or the letter of credit, to pay for the license.  Instead, Fitzpatrick and Stitt arranged a complex transaction in which Liberate, through two intermediary companies, secretly provided the funds to pay for its own license—a so-called "round-trip sale."

24.     The round-trip sale was completed in July 2002, when Liberate finalized a contract with a separate company, Signatures Network, Inc. ("Signatures"), which gave Liberate a license

COMPLAINT

1   to use certain music video clips and related material. Pursuant to this contract, on or about July

2   22, 2002 Liberate wired $1.2 million to Signatures. Signatures retained $280,000 and that same

3   day wired the balance, or $920,000, to another company, E Street Studios. Of this amount, E

4   Street Studios retained $230,000 and on or about July 23, 2002 gave the balance, or $690,000, to

5   Mod. On or about July 24, 2002, Mod wired $543,750 to Liberate to pay for the software license

6   the Company had previously sold it.

7       25.     Under Liberate's internal revenue recognition policy and GAAP, it was improper for

8   Liberate to recognize revenue on the software license to Mod in the quarter ended May 31, 2002.

9   The transaction conferred no economic benefit on Liberate because it was part of a larger round-

10  trip sale in which Mod intended to use Liberate's own funds to pay for the Liberate software

11  license.

12      26.     Fitzpatrick and Stitt knew or were reckless in not knowing that revenue recognition

13  was improper. Defendants knew, but failed to inform Liberate's finance personnel, that the

14  agreement with Mod was only part of a larger transaction in which Mod would use Liberate's

15  own funds to pay for the Liberate software license.

16   **C.   Fitzpatrick and Stitt Caused Liberate to Recognize Revenue Improperly by**
         **Providing False Information About Liberate's Progress on a Long-Term Project**
17

18      27.     For the quarter ended August 31, 2002, Liberate recognized $615,526 of revenue on a

19  long-term service contract with @NetHome, a Japanese company. Liberate accounted for the

20  contract under the percentage-of-completion method, which allowed the Company to recognize

21  revenue each quarter based on how much work it had performed on the contract and how much

22  remained to be done. Revenue recognition in the quarter ended August 31, 2002 was improper

23  because Fitzpatrick and Stitt misled Liberate's finance department concerning the amount of

24  work remaining on the contract.

25      28.     As part of its acquisition of another company in August 2002, Liberate assumed

26  responsibility for a long-term service contract with @NetHome. In or about the week of August

27  12, 2002, Fitzpatrick directed Stitt to determine the extent of work remaining on the contract so

28  that they could provide this information to Liberate's finance department. Fitzpatrick and Stitt

COMPLAINT

1  knew that Liberate's finance department would rely on the information they provided in

2  determining how much, if any, revenue Liberate could recognize on the contract for the August

3  31 quarter.

4      29.    As Stitt began to investigate, he received incomplete and contradictory information

5  about the amount of work remaining to be done. Stitt communicated this fact to Fitzpatrick

6  during August 2002.

7      30.    Despite this, in late August 2002 Fitzpatrick and Stitt told Liberate finance personnel

8  that the contract was substantially complete and that only minor work remained. There was no

9  reasonable basis for defendants' representation. Both Fitzpatrick and Stitt knew or were reckless

10  in not knowing that they did not have sufficient information about the contract to determine that

11  only minor work remained to be done.

12      31.    In fact, as Liberate later concluded, the amount of work remaining on the contract was

13  substantial, and would require hundreds of man-hours to complete.

14      32.    Under Liberate's internal revenue recognition policy and GAAP, it was improper for

15  Liberate to recognize revenue on the @NetHome contract for the quarter ended August 31, 2002

16  because the Company still had substantial work to do on the contract. Fitzpatrick and Stitt knew

17  or were reckless in not knowing that revenue recognition was improper.

18  **D.**    **Fitzpatrick Caused Liberate to Recognize Revenue Improperly on a Transaction
19  in Which He Granted a Customer Secret Price Concessions**

20      33.    On or about August 30, 2002, Fitzpatrick sent an electronic mail ("email") to an

21  official at Telewest Communications ("Telewest"), a British cable company that was one of

22  Liberate's largest customers. In the email, Fitzpatrick granted Telewest discounts on support and

23  professional services under an existing long-term contract with Liberate. Fitzpatrick granted the

24  concessions, which would reduce the amount of revenue Liberate could recognize under the

25  contract by $1.2 million, without informing Liberate's finance personnel.

26      34.    As a result of Fitzpatrick's conduct, Liberate improperly recognized $1.2 million in

27  revenue under its contract with Telewest. Most of this revenue, or approximately $900,000, was

28  recognized in Liberate's first quarter of fiscal 2003, ended August 31, 2002.

COMPLAINT

35.     Under Liberate's internal revenue recognition policy and GAAP, it was improper for Liberate to recognize this revenue on the Telewest contract because of price concessions that required Liberate to provide discounted or free services.  Fitzpatrick knew or was reckless in not knowing that revenue recognition was improper.

**II.  Defendants' Misrepresentations and Omissions to Auditors**

    **A.     Fitzpatrick's False Statements and Omissions Concerning an Unauthorized Purchase Order**

36.     On or about September 4, 2002, without informing Liberate's finance personnel, a Liberate employee based in Britain entered into an agreement (a "purchase order") that obligated the Company to purchase $1.3 million in services from Global Interactive Technology ("GiT"), a subsidiary of a Liberate customer called Global Business Solutions.

37.     In mid-September 2002, Liberate finance personnel heard a rumor that such a purchase order had been issued.  On or about September 18, 2002, Liberate's then-Chief Financial Officer ("CFO") asked Fitzpatrick to speak with the employee in Britain to determine whether the employee had, in fact, issued the purchase order.

38.     On or about September 19, 2002, Fitzpatrick spoke on a telephone call with the Liberate employee in Britain and Liberate's then-Vice President of Sales for the Europe, Middle East and Africa Region.  During this call, the Liberate employee confirmed that he had issued a $1.3 million purchase order.  Upon learning this, Fitzpatrick instructed the others on the call not to reveal the existence of the purchase order to Liberate's finance personnel.  In addition, Fitzpatrick falsely reported back to Liberate's then-CFO that no such purchase order had been issued.

39.     Also on or about September 19, 2002, Fitzpatrick signed a letter to Liberate's independent auditors (a "management representation letter").  Fitzpatrick back-dated the letter to September 18, 2002.  In the letter, Fitzpatrick represented, among other things, that he had informed Liberate finance personnel of all agreements with Liberate customers to purchase goods or services, and that he was not aware of any matters or occurrences that would materially affect

COMPLAINT

the recognition of revenue in Liberate's financial statements for the year. As Fitzpatrick knew, these representations were false because he had falsely denied the existence of the $1.3 million purchase order to Liberate finance personnel, which would offset and reduce the revenue that Liberate could recognize on its contract with GiT's parent company.

**B.    Defendants' Other Misrepresentations and Omissions to Auditors**

40.    In connection with Liberate's audit for the fiscal year May 31, 2002, defendants each signed a management representation letter to the Company's independent auditors. Stitt dated his letter June 11, 2002. Fitzpatrick's letter was dated August 5, 2002.

41.    In their respective letters, each defendant represented that, among other things, he was not aware of any matters or occurrences that would materially affect the recognition of revenue in Liberate's financial statements for the year. For the reasons alleged herein, Fitzpatrick and Stitt knew that this representation was false.

42.    In connection with a review of Liberate's financial results for the first quarter of its fiscal year 2003, ended August 31, 2002, defendants again each signed a management representation letter to the Company's independent auditors. Stitt dated his letter September 1, 2002. As alleged above, Fitzpatrick dated his letter September 18, 2002.

43.    In their respective letters, each defendant represented that, among other things, he was not aware of any matters or occurrences that would materially affect the recognition of revenue in Liberate's financial statements for the year. For the reasons alleged herein, Fitzpatrick and Stitt knew that this representation was false.

**III.    As a Result of Defendants' Fraud, Liberate Reported False Financial Results**

44.    During the course of defendants' fraud, Liberate filed with the Commission the following periodic reports: (a) on or about January 14, 2002, Liberate filed a Form 10-Q for the second quarter of fiscal year 2002, which ended November 30, 2001; (b) on or about April 12, 2002, Liberate filed a Form 10-Q for the third quarter of fiscal year 2002, which ended February 28, 2002; and (c) on or about August 8, 2002, Liberate filed a Form 10-K for fiscal year 2002, which ended May 31, 2002.

COMPLAINT

45.     The Company did not file a Form 10-Q for the first quarter of its fiscal year 2003, which ended August 31, 2002.  However, on or about September 26, 2002, Liberate issued a press release announcing its financial results for that quarter to the public, and held an earnings release conference call in which Fitzpatrick participated.

46.     In addition, on or about July 2, 2002 Liberate filed with the Commission a Form S-8 that registered shares for an employee benefits plan.  The Form S-8 incorporated by reference all of the quarterly reports that Liberate had previously filed relating to its fiscal year 2002, and also all of the subsequently filed financial statements during the course of defendants' fraud.

47.     As a result of defendants' conduct, each of these Form 10-Qs, the Form 10-K, the press release and the Form S-8 contained false financial results that materially overstated Liberate's revenue for the respective periods.

48.     Liberate subsequently announced that it would restate its financial results for the second and third quarters of fiscal 2002 and for the entire fiscal year, and also for the first quarter of fiscal 2003.  As part of the restatement, Liberate reversed or delayed revenue recognition on each of the transactions described herein.

**FIRST CLAIM FOR RELIEF**
*(Violations of Section 17(a) of the Securities Act by Fitzpatrick)*

49.     The Commission realleges and incorporates by this reference Paragraphs 1 through 48, above.

50.     By engaging in the conduct described above, Fitzpatrick, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

(a)     employed devices, schemes, or artifices to defraud;

(b)     obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

COMPLAINT

1

        (c)      engaged in transactions, practices, or courses of business which

2

             operated or would operate as a fraud or deceit upon the

3

             purchasers.

4

    51.     By reason of the foregoing, Fitzpatrick violated, and unless restrained and enjoined,

5

will continue to commit violations of, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

6

**SECOND CLAIM FOR RELIEF**

7

*(Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Thereunder by Fitzpatrick and Stitt).*

8

    52.     The Commission realleges and incorporates by this reference Paragraphs 1 through 48,

9

above.

10

    53.     By engaging in the conduct described above, Liberate, Fitzpatrick and Stitt, directly or

11

indirectly, in connection with the purchase or sale of securities, by the use of means or

12

instrumentalities of interstate commerce, or the mails:

13

        (a)      employed devices, schemes, or artifices to defraud;

14

        (b)     made untrue statements of material facts or omitted to state

15

             material facts necessary in order to make the statements made, in

16

             the light of the circumstances under which they were made, not

17

             misleading; and

18

        (c)      engaged in acts, practices, or courses of business which operated

19

             or would operate as a fraud or deceit upon other persons,

20

             including purchasers and sellers of securities.

21

    54.     By reason of the foregoing, Fitzpatrick and Stitt violated Section 10(b) of the

22

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

23

    55.     Fitzpatrick and Stitt also knowingly provided substantial assistance to Liberate's

24

violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. §

25

240.10b-5], and therefore are liable as aiders and abettors pursuant to Section 20(e) of the

26

Exchange Act [15 U.S.C. § 78t(e)].

27

28

COMPLAINT

56.     Unless restrained and enjoined, Fitzpatrick and Stitt will continue to violated and aid and abet violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

### THIRD CLAIM FOR RELIEF
*(False Statements and Omissions to Accountants and Auditors—*
*Violation of Rule 13b2-2 by Fitzpatrick and Stitt)*

57.     The Commission realleges and incorporates by this reference Paragraphs 1 through 48, above.

58.     By engaging in the acts and conduct alleged above, Fitzpatrick and Stitt, directly or indirectly, made or caused to be made a materially false or misleading statements or omitted to state or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Liberate required to be made or the preparation or filing of reports required to be filed by Liberate with the Commission.

59.     By reason of the foregoing, Fitzpatrick and Stitt violated and, unless restrained and enjoined, will continue to violate Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### FOURTH CLAIM FOR RELIEF
*(False Periodic Reports—Aiding and Abetting Violations of Section 13(a)*
*of the Exchange Act And Rules 12b-20, 13a-1, and 13a-13 Thereunder by Stitt)*

60.     The Commission realleges and incorporates by this reference Paragraphs 1 through 48, above.

61.     Based on the conduct alleged above, Liberate violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13], which obligate issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to file with the Commission accurate quarterly and annual reports.

62.     By engaging in the conduct alleged above, Stitt knowingly provided substantial assistance to Liberate's filing of materially false and misleading quarterly and annual reports with the Commission.

12

COMPLAINT

63.     By reason of the foregoing, Stitt has aided and abetted violations by Liberate of

Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, and 13a-13

thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13] and therefore is liable as an

aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Unless

restrained and enjoined, Stitt will continue to aid and abet such violations.

## FIFTH CLAIM FOR RELIEF
*(Inaccurate Books and Records—Aiding and Abetting Violations of*
*Section 13(b)(2)(A) of the Exchange Act by Stitt)*

64.     The Commission realleges and incorporates by this reference Paragraphs 1 through 48,

above.

65.     Based on the conduct alleged above, Liberate violated Section 13(b)(2)(A) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(A)], which obligates issuers of securities registered

pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] to make and keep books, records

and accounts which, in reasonable detail, accurately and fairly reflect the transactions and

dispositions of the assets of the issuer.

66.     By engaging in the conduct alleged above, Stitt knowingly provided substantial

assistance to Liberate's failure to make and keep books, records and accounts which, in

reasonable detail, accurately and fairly reflect its transactions and dispositions of its assets.

67.     By reason of the foregoing, Stitt has aided and abetted violations by Liberate of

Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] and therefore is liable as an

aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Unless

restrained and enjoined, Stitt will continue to aid and abet such violations.

## SIXTH CLAIM FOR RELIEF
*(Inadequate Internal Accounting Controls—Aiding and Abetting*
*Violations of Section 13(b)(2)(B) of the Exchange Act by Stitt)*

68.     The Commission realleges and incorporates by this reference Paragraphs 1 through 48,

above.

69.     Based on the conduct alleged above, Liberate violated Section 13(b)(2)(B) of the

Exchange Act [15 U.S.C. § 78m(b)(2)(B)], which obligates issuers of securities registered

COMPLAINT

1   pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient

2   system of internal accounting controls.

3       70.   By engaging in the conduct alleged above, Stitt knowingly provided substantial

4   assistance to Liberate's failure to devise and maintain a sufficient system of internal accounting

5   controls.

6       71.   By reason of the foregoing, Stitt has aided and abetted violations by Liberate of

7   Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)] and therefore is liable as an

8   aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].  Unless

9   restrained and enjoined, Stitt will continue to aid and abet such violations.

10                                         **SEVENTH CLAIM FOR RELIEF**

11   *(Circumventing Internal Accounting Controls—Violations of*
       *Section 13(b)(5) of the Exchange Act and Rule 13b2-1 by Stitt)*

12       72.   The Commission realleges and incorporates by this reference Paragraphs 1 through 48,

13   above.

14       73.   By his conduct alleged above, Stitt has violated Section 13(b)(5) of the Exchange Act

15   [15 U.S.C. 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] which prohibit

16   anyone from knowingly circumventing a system of internal accounting, or knowingly falsifying

17   certain books, records, and accounts.

18       74.   Unless restrained and enjoined, Stitt will continue to violate Section 13(b)(5) of the

19   Exchange Act [15 U.S.C. § 78m(b)(5)], and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

20                                             **PRAYER FOR RELIEF**

21       WHEREFORE, the Commission respectfully requests that this Court:

22                                                    I.

23       Permanently enjoin Fitzpatrick from directly or indirectly violating Section 17(a) of the

24   Securities Act, and from violating or aiding and abetting violations of Section 10(b) of the Exchange

25   Act and Rules 10b-5 and 13b2-2 thereunder;

26

27

28

COMPLAINT

1

II.

2    Enjoin Fitzpatrick from serving as an officer or director of any entity having a class of

3 securities registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. §

4 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. §

5 78o(d)];

6

III.

7    Order Fitzpatrick to pay civil penalties pursuant to Section 20(d) of the Securities Act [15

8 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

9

IV.

10    Permanently enjoin Stitt from directly or indirectly violating Section 13(b)(5) of the Exchange

11 Act and Rule 13b2-1 thereunder, and from violating or aiding and abetting violations of Sections

12 10(b), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act, and Rules 10b-5, 12b-20, 13a-1, 13a-13 and

13 13b2-2 thereunder.

14

V.

15    Enjoin Stitt from serving as an officer or director of any entity having a class of securities

16 registered with the Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that

17 is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

18

VI.

19    Order Stitt to pay civil penalties pursuant to Section 21(d) of the Exchange Act [15 U.S.C. §

20 78u(d)].

21

VII.

22    Order Fitzpatrick and Stitt to disgorge all benefits they obtained wrongfully as a result of their

23 violations of the federal securities laws alleged in this Complaint, including prejudgment interest.

24

VIII.

25    Retain jurisdiction of this action in accordance with the principles of equity and the Federal

26 Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that

27 may be entered, or to entertain any suitable application or motion for additional relief within the

28 jurisdiction of this Court.

COMPLAINT

IX.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED:        September 30, 2004        Respectfully submitted,

Helane L. Morrison
Robert L. Mitchell
Michael S. Dicke
Craig M. Hughes

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

16                                      COMPLAINT